<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civ. Action No. 08-1951 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOSEPH CAMPBELL, M.D., | : | |
| | : | |
| Defendant, | : | **OPINION** |
| v. | : | |
| | : | |
| UNIVERSITY OF MEDICINE AND | : | |
| DENTISTRY OF NEW JERSEY, | : | |
| MERWIN RICHARD, M.D. and | : | |
| JERROLD J. ELLNER, M.D., | : | |
| | : | |
| Third Party Defendants. | : | January 4, 2011 |
| | : | |

**WIGENTON**, District Judge.

Before the Court is plaintiff the United States of America's (the "United States") motion for partial summary judgment against the defendant Joseph Campbell ("Defendant Campbell" or "Campbell") on Count I of the Amended Complaint filed September 19, 2008 to recover statutory damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 for violation of the Anti-Self Referral Act (also known as the "Stark Act"), 42 U.S.C. § 1395nn, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Motion for Partial Summary Judgment").

Also before the Court are motions for summary judgment on all three counts of the Answer

to the Amended Complaint and Amended Third Party Complaint of Defendant Campbell filed

September 24, 2008 (also referred to as "Amended Third Party Complaint").  These motions for

summary judgment were filed individually by the following third party defendants: the University

of Medicine and Dentistry of New Jersey ("UMDNJ"), Merwin Richard, M.D. ("Richard") and

Jerrold J. Ellner, M.D. ("Ellner")(collectively referred to as the "Third Party Defendants").[1]

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.  Venue

is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).  The Court, having considered the

parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil

Procedure 78.

For the reasons discussed below, the Court denies the Motion for Partial Summary Judgment

by the United States and grants the Third Party Motions for Summary Judgment as to Counts I and

II of the Amended Third Party Complaint.[2]


**BACKGROUND**

UMDNJ is the state's university for health sciences, the components of which are the

UMDNJ-New Jersey Medical School ("NJMS") and the UMDNJ-University Hospital ("University

Hospital" or "UH").  University Hospital was a Level 1 Trauma Center licensed and regulated by

the state of New Jersey.  (Am. Compl. ¶ 19.)  Maintenance of this license was dependent on the

annual performance of a certain number of cardiac procedures, including cardiac catheterizations and

---

[1]  The motions for summary judgment filed by the Third Party Defendants will collectively be referred to as the "Third Party Motions for Summary Judgment."

[2]  Defendant Campbell has withdrawn Count III of the Amended Third Party Complaint.  (*See* Def.'s Br. in Opp. to UMDNJ & Richard 3 n.2).

cardiothoracic surgeries.  (*Id.*)  However, since 1995 the University Hospital failed to perform the requisite number of cardiac procedures to maintain its Level 1 Trauma Center license.  (*Id.* at ¶ 22.)

During Spring 2002, in an effort to increase the number of cardiothoracic patients that were referred to UMDNJ and to avoid losing its Level 1 accreditation, UMDNJ engaged in a cardiology recruitment initiative to increase the number of cardiothoracic patients referred to University Hospital.  (*Id.* at ¶ 23; Pl.'s Br. 10.)  Pursuant to this initiative, UMDNJ entered into part-time employment contracts with local community cardiologists in private practices, who had patients they could refer to University Hospital for cardiac-related procedures.  (Am. Compl. ¶ 23; Pl.'s Br. 10.) These cardiologists were contracted to work part-time at University Hospital as Clinical Assistant Professors ("CAP"), performing various services for UMDNJ including  teaching, lecturing and research in exchange for an annual salary.  (Am. Compl. ¶ 24.)  Pursuant to the CAP contracts, these local or community cardiologists received annual salaries of between $50,000 and $180,000. (*Id.* at ¶ 25.)

Defendant Campbell was a cardiologist in private practice who was approached by UMDNJ. He is a medical doctor licensed to practice in the state of New Jersey with a private medical practice specializing in cardiology located in Irvington, New Jersey.  (Campbell Cert. ¶ 2.)  After a series of meetings and negotiations with UMDNJ administration (including doctors  Ellner and Richard) in January of 2003, Defendant Campbell accepted a position as a part-time CAP at NJMS.  (Am. Compl. ¶ 28; Pl.'s Br., Ex. 4-C, Campbell's CAP Contract.)  Pursuant to the employment contract, a letter agreement dated January 15, 2003, Defendant Campbell was required to spend his "part-time (48%) service" performing the following activities on behalf of the University Hospital and NJMS:

> 1. [Teaching] fellows at cardiac catheterization procedures.

3

2. [Interpreting] hospital electrocardiograms.
3. [Attending] weekly cardiology conferences.
4. Physical diagnosis course for second year medical students
5. Office-based teaching for medical students, internal medicine residents, cardiology fellow and other students (e.g. nursing, technical)
6. Lecturing in areas of special expertise.
7. Support research efforts with patient identification from your practice.
8. Complete Medicare time studies or such other documents required for documenting services under the program and for documenting services as outlined in this letter.

(Pl.'s Br., Ex. 4-C, Campbell's CAP Contract 1; Am. Compl. ¶ 28.)  In exchange for these services, Defendant Campbell was compensated at an annual rate of $75,000.  (Pl.'s Br., Ex. 4-C, Campbell's CAP Contract 1; Am. Compl. ¶ 28.)  Defendant Campbell states that he "duly performed all of the services enumerated in the contract which he was given the opportunity to perform, and that he was compensated until the contract was canceled." (Answer to Am. Compl. and Am. Third Party Compl. 4 at ¶ 29.)

Ellner was Chairman of UMDNJ's Department of Medicine and oversaw several divisions, including the division where Defendant Campbell worked as a CAP. *(See* Answer to Am. Compl. and Am. Third Party Compl. 10 at ¶ 3.)  Richard was the Interim Director of UMDNJ's Catherization Laboratory and was involved with CAP recruiting. (*Id.* at 10-11, ¶¶ 2-4.) In late 2002, Richard, Ellner and other UMDNJ representatives met with Defendant Campbell for an introductory meeting to solicit his employment with UMDNJ as a CAP.  (*Id.* at 11, ¶ 4.)  After subsequent conversations, Richard informed Campbell that he was awarded the contract.  (*Id.* at 11, ¶¶ 4-7.)  Richard said he would confirm that the employment contract and arrangement did not violate the Stark Act.  (*Id.* at 11, ¶ 8.)  Two weeks later, Richards informed Defendant Campbell that "UMDNJ's attorneys had confirmed that the proposed employment contract and arrangement were

4

lawful and acceptable." (*Id.*)  Defendant Campbell claims he relied on these assurances and did not consult independent legal counsel in connection with the legality of the contract as a result.  (*Id.*; *Id.* at 13-14, ¶¶ 15, 17; Pl.'s Br. at 25.)

UMDNJ participates in the Medicare program and submits claims through its financial intermediary to Medicare for medical services it renders to beneficiaries.  (Am. Compl. ¶ 20.)  From January 2003 to December 2003, "Medicare paid UMDNJ over $230,000 for cardiac-related medical procedures that were performed at UMDNJ on at least 8 patients referred from Defendant Campbell's private cardiology practice." (Pl.'s Br. 12.)[3]  A W-2 form provides that during this same time period Defendant Campbell received payments from UMDNJ totaling approximately $70,000. (*Id.*; Pl.'s Br., Ex. 4-D.)  The United States contends that the primary service Defendant Campbell performed under his employment contract was to refer patients from his private cardiology practice to UMDNJ for inpatient and outpatient hospital services.  (Pl.'s Br. 12.)  Many of these services were paid for by Medicare and Medicaid.  (Am. Compl. ¶¶ 54-62.)

During Defendant Campbell's tenure as a CAP for UMDNJ, he was allegedly suspended multiple times for failing to prepare medical charts on a timely basis.  (Richard's Br. 4 at ¶ 18.) Defendant Campbell denies this claim.  (6/24/10 Def.'s Resp. Statement to Ellner ¶¶ 94.)   In an e-mail dated December 1, 2003, Richard recommended to Ellner that Defendant Campbell be terminated because of persistently being on the physician suspension list and having a "60% normal cardiac cath rate for [the] quarter, well above state limits."  (Richard's Br. 4 at ¶ 18; 4/26/10 Gibbs Cert., Ex. K.)  On December 8, 2003, UMDNJ terminated Defendant Campbell's employment via

---

[3]  The Amended Complaint also provides the following: "From in or about January 2003 to in or about December 2003, Medicare paid more than $55,000 for cardiac-related procedures that were performed at UH on more than 7 patients referred from Defendant's private cardiology practice."

a letter from Ellner.  (Richard's Br. 4 at ¶ 18; 4/26/10 Gibbs Cert.,  Ex. L.)

      A federally-appointed monitor ("Federal Monitor") performed a 5-month long investigation of UMDNJ's cardiology program in 2002 and prepared a monitor's report, dated November 13, 2006,  with his findings ("Monitor's Report").  (6/8/10 Robins Cert., Ex. I, Monitor's Report.)  The Monitor's Report alleged that UMDNJ devised an illegal scheme to pay cardiologists for patient referrals in order to maintain its cardiac surgery license. (*Id.*)  Among the Federal Monitor's findings was that UMDNJ settled a matter with Dr. Rohit Arora,[4] who claimed he was "fired for protesting the illegal scheme" regarding UMDNJ's cardiology and CAP program, for $2.2 million.  (*Id.* at 1-2.)  This settlement was never reported to the Federal Monitor or properly authorized by UMDNJ.  (*Id.*).  As a result of the Federal Monitor's investigation, on September 30, 2009, UMDNJ entered into a settlement agreement, pursuant to which UMDNJ paid approximately $8.33 million to the United States ("double the USA's damages for false claims submitted by UMDNJ on behalf of certain CAPs, including Dr. Campbell") in exchange for the relinquishment of civil claims for violation of the False Claims Act related to Medicare billing.  (UMDNJ's Statement of Facts 8; 4/26/10 Scrivo Cert., Ex. L.)

## PROCEDURAL HISTORY

      On April 22, 2008, the United States filed a seven count complaint against Defendant Campbell for claims related to the False Claims Act ("Complaint").  (*See* Pl.'s Compl.)  Defendant Campbell filed his answer to the Complaint and a third party complaint on May 28, 2008 against

---

[4]Dr. Arora was the former director of the Cardiac Catherization Laboratory.

UMDNJ and Richard with claims for contribution, indemnification, and damages for their allegedly false representations concerning the legality of his employment contract upon which he claims he justifiably relied ("Answer and Third Party Complaint").  (*See* Answer to Compl. and Third Party Compl.).  On September 19, 2008, the United States filed an amended complaint with the following claims: (I) violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), for presenting claims to Medicare and Medicaid for services rendered as a result of illegal financial relationships; (II) violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), for the use of false statements; (III) violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), for using a false record to avoid an obligation to refund; (IV) common law fraud; (V) unjust enrichment; (VI) disgorgement; and (VII) payment under mistake of fact ("Amended Complaint").  (*See* Am. Compl.) On September 24, 2008, Defendant Campbell filed an amended answer and amended third party complaint naming Ellner along with UMDNJ and Richard as third party defendants for his cross-claims ("Amended Answer and Amended Third Party Complaint").

The United States now moves for partial summary judgment on Count I of the Amended Complaint.  Third party defendants UMDNJ, Richard and Ellner individually move for summary judgment on all claims in the Amended Third Party Complaint.[5]

---

[5]Although the Third Party Defendants filed separate motions, they contain similar arguments and each of their motions relied, at least in part, on arguments raised by another third party defendant. UMDNJ filed their motion on April 26, 2010, Richard filed his motion on April 26, 2010 and Ellner filed his motion on May 17, 2010.  The United States filed its motion for partial summary judgment on April 26, 2010.

## LEGAL STANDARD

*Summary Judgment*

Summary judgment shall be granted if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). Federal Rule of Civil Procedure 56 provides that a "party asserting that a fact cannot be or is genuinely disputed" must support such an assertion by:

> a) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The court may not weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving

party. *Masson v. New Yorker Magazine, Inc.*,  501 U.S. 496, 520 (1991).

Stark Act

The Social Security Act contains provisions commonly known as the Anti-Self Referral Acts or the Stark Act, 42 U.S.C. § 1395nn ("Stark Act"),[6] which prohibit the presentation of a claim to Medicare for a "designated health service by an entity where the service was furnished pursuant to a prohibited referral by a physician that has a financial relationship with the entity." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 239 n.6 (3d Cir. 2004); 42 U.S.C. § 1395nn(a).  The Stark Act does include an exception for "bona fide employment relationships." 42 U.S.C. § 1395nn(e)(2).  The Stark Act allows hospitals to submit Medicare claims based on referrals from employee physicians if the employment is a "bona fide relationship."  A "bona fide relationship" is one that meets the following criteria: 1) the employment is for "identifiable services"; 2) the amount of the remuneration meets the following requirements: a) "is consistent with the market value of the services, and b) "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician"; and 3) compensation must be "commercially reasonable" even if no referrals were made to the employer. *See* 42 U.S.C. § 1395nn(e)(2).

"The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital." *Rogan*,

---

[6] Congress amended the Social Security Act by passing the Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn. These amendments to the Social Security Act are referred to as the Stark Act. *See United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

9

459 F. Supp. 2d at 711.  Compliance with the Stark Act is a condition of payment for claims from Medicare.  If claims are submitted in violation of the Stark Act, the claims are considered false claims.

Courts have held that once the United States has "demonstrated proof of each element of a violation of the Anti-Kickback and/or Stark Statutes, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception." *Rogan*, 459 F. Supp. 2d at 716 (internal citations omitted).


*False Claims Act*

The False Claims Act (or "FCA") establishes a civil cause of action for the recovery of damages and penalties from those who submit false or fraudulent claims to the United States.  To establish a prima facie case under the FCA, the relator must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.  31 U.S.C. § 3729; *Landau v. Lucasti*, 680 F. Supp. 2d 659,665 (D.N.J. 2010).  The FCA defines "knowing" as including a defendant's "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of information in the defendant's claim to the government.  31 U.S.C. § 3729(b); *Landau*, 680 F. Supp. 2d at 665; *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir.2007).  Further, "no proof of specific intent to defraud is required."  *See* 31 U.S.C. § 3729(b)(1)(B). However, "Congress did not intend to punish 'honest mistakes or incorrect claims submitted through mere negligence.'"  *Landau*, 680 F. Supp. 2d at 665 (internal citation

10

omitted).  The "United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence."  *Rogan*, 459 F. Supp. 2d at 716; 31 U.S.C. § 3731(d).

## DISCUSSION

*Plaintiff's Motion for Partial Summary Judgment on Count I of the Amended Complaint*

The United States has requested partial summary judgment on Count I for violations of the False Claims Act.  In Count I of the Amended Complaint, the United States alleges that Defendant Campbell violated the Stark Act and False Claims Act when he knowingly caused false claims to be submitted by referring Medicare patients to UMDNJ, an entity with which Defendant Campbell had a financial relationship.[7]  (Am. Compl. ¶¶ 63-65.)  The United States contends that the CAP agreement between Defendant Campbell and UMDNJ was a "sham contract" and that Defendant Campbell was being paid to refer patients to UMDNJ.  (Pl's Br. 1-2, 12.)  The United States asserts that Defendant Campbell knew the claims for Medicare patients submitted by UMDNJ for the patients he referred were materially false because they were submitted in violation of the Stark Act.  (*Id.* at 2.)  As the United States points out, Defendant Campbell concedes that he <u>now</u> knows that the Stark Act was violated.  Specifically, Defendant Campbell testified at his deposition that ". . .

---

[7]  Count I of the Amended Complaint alleges that "Defendant [Campbell] knowingly caused to be presented, false and fraudulent claims for approval to the United States, including claims for reimbursement for services rendered to patients Defendant [Campbell] unlawfully referred to Provider [UMDNJ and UH collectively] in violation of the Stark Statute and the [Anti-Kickback Statute]." (Am. Compl. ¶ 64).  A person who offers or pays remuneration to another person violates the Medicare Anti-Kickback Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals.  *See* 42 U.S.C.§ 1320a-7b.  The Motion for Partial Summary Judgment by the United States focuses on arguments regarding Defendant Campbell's violation of the False Claims Act and the Stark Act as is relevant to Count I against Defendant Campbell.  (*See* Pl.'s Br.)

I have come to understand, you know, later on after I have left the University that the Stark law was violated . . ." (*Id.* at 3; *Id.*, Ex. 4, 10/13/09 Campbell Dep. 97:10-12.)  As such, the United States claims that it has met all three prongs to establish a prima facie claim pursuant to the False Claims Act.

In the instant matter, Defendant Campbell does not deny that UMDNJ submitted claims to Medicare for patients he referred to the University Hospital.  Rather, Defendant Campbell raises several other arguments against the Motion for Partial Summary Judgment submitted by United States.  First, Defendant Campbell argues that even if the claims were false, he did not submit the claims or "cause" the false claims to be submitted to Medicare as required by the first prong to establish a prima facie case under the FCA.  (Def.'s Opp. to Pl. 4)  However, Defendant Campbell knew that the patients he referred to UMDNJ were Medicare patients.  (Pl.'s Br., Ex. 4, 10/13/09 Campbell Dep. 95:9-12.)  Defendant Campbell has acknowledged that he knew UMDNJ would charge a facility and service fee to Medicare for the patients that he referred to UMDNJ.  (*Id.* at 95:1-12.)

Second, Defendant Campbell asserts that the claims were not false as required by the second prong of the FCA because 1) Defendant Campbell saw the patients that he referred to UMDNJ himself; and 2) he had a legitimate employment contract with UMDNJ, but simply was not allowed to fulfill the requirements of that contract.  Defendant Campbell tries to establish that he qualifies for the bona fide employment relationship exception to the Stark Act.  *See United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F. 3d 88, 95 (3 Cir. 2009) ("Once the plaintiff or the government has established proof of each element of a violation under the [Stark] Act, the burden shifts to the defendant to establish that the conduct was protected by an exception.").

12

Defendant Campbell argues that he did not violate the Stark Act because his "treatment of his own patients at UH was not an unlawful 'referral' under Stark." (Def.'s Opp. to Pl. 1.) However, the comments regarding section 1877 of the Social Security Act provide the following: "We have concluded that when a physician initiates a designated health service and personally performs it him or herself, that action would not constitute a referral of the service to an entity under section 1877 of the Act.  However, in the context of inpatient and outpatient hospital services, there would still be a referral of any hospital service, technical component, or facility fee billed by the hospital in connection with the personally performed service . . . If the referring physician has a financial relationship with the hospital, that relationship must fit in an exception."   66 Fed. Reg. 941,  42 C.F.R. pts. 411, 424 (2001).

Pursuant to section 1877 of the Social Security Act, the claims  for facility and service fees based on patient referrals from a physician with a financial relationship with a hospital, which does not meet the requirements for an exception, would be considered a referral and are prohibited by the Stark Act provisions.  *Id*.  It is the defendant's burden to establish that an exception to the Stark Act applies regarding the financial relationship at issue.  *See Rogan*, 459 F. Supp. 2d at 716.  Defendant Campbell's contract for employment as a CAP required him to perform tasks including teaching, research and patient care activities at UMDNJ.  (4/26/10 Gibbs Cert., Ex. H.)  UMDNJ did not require Defendant Campbell to meet the requirements of his contract nor did Defendant Campbell meet those requirements.

In dispute is to what extent Defendant Campbell actually performed the services outlined in his contract as a part-time CAP and whether it was sufficient to support a legitimate employment relationship with UMDNJ.  The United States contends that "[a]s Defendant admits in his discovery

13

responses and deposition testimony, he completely failed to perform the majority of the services identified in his contract." (Pl.'s Br. 20.) Defendant Campbell did not perform all of the duties listed in his employment contract, but he claims he provided all the services in his contract that he was "given the reasonable opportunity to perform." (Campbell Cert. ¶¶ 9-10.) Defendant Campbell argues that he performed more duties at UMDNJ as a CAP than he did previously with UMDNJ, but admits that his responsibilities did not include all the items listed in his CAP contract, nor did he believe he was required to perform all the tasks listed in his CAP contract at all times. (Campbell Cert. ¶¶ 10-16.) For example, he did not teach a physical diagnosis course or office based teaching as specified in his contract. (*Id.* ¶ 15; Pl. Br. 20.) He also did not attend conferences on a regular basis or complete Medicare time studies (Pl. Br. 20-21.)

As the United States notes, even if Defendant Campbell believed that he was entering a legitimate employment contract he did not have to meet the requirements of that contract during his "employment." Thus, the $70,000 payment he received for the [ten] months that he held the title of Clinical Assistant Professor with UMDNJ, could not be considered "commercially reasonable" or the "fair market value of the services." (Pl.'s Br. 18-19.)     Defendant Campbell relies on an expert report that supports the argument that his salary as a CAP at UMDNJ was for fair market value.[8] (Def.'s Opp. to Pl. 1). However, it is not just a matter of whether the salary of $75,000 annually was unreasonable for an employee who works and fulfills the obligations of a CAP.   If there was no requirement to actually perform the duties of a CAP then the compensation could not be the fair

_____

[8]  The United States also notes issues with Defendant Campbell's qualifications to be a Clinical Assistant Professor, including lack of teaching experience and publications, and having failed the cardiology board three times. (Pl.'s Br. 3.)

market value for those services, and thus would serve some other purpose, such as compensation for patient referrals.  "The finder of fact may infer that payments were intended to be kickbacks based on testimony that the recipient of the payments 'was grossly overpaid . . . for any legitimate professional services he may have rendered.'" *Rogan*, 459 F. Supp. 2d at 716 (quoting *United States v. Norton*, No. 2:99CR10078, 2000 WL 33281703, at *4 (W.D.Va. Nov.14, 2000)).  Thus, unless Defendant Campbell qualifies for  bona fide employee exception, his conduct would be considered referring patients to UMDNJ in violation of the Stark Act, and the claims submitted to Medicare were false.  The record before the Court does not demonstrate that Defendant Campbell qualifies for such an exception.

Next, Defendant Campbell argues that the United States has not met the third prong to recover under the FCA.  Defendant Campbell argues that he did not "knowingly" or "recklessly" submit false claims as defined by the FCA, and that his state of mind or scienter cannot be appropriately decided on summary judgment.  The United States asserts that Defendant knew that false claims would be submitted to Medicare, or at the very least acted with reckless disregard as required by the FCA.

As previously discussed, the FCA defines "knowing" as including a defendant's "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of information in the defendant's claim to the government.  31 U.S.C. § 3729(b).  The United States acknowledges that the "remaining question" for Count I is "whether Defendant had the requisite knowledge at the time he referred Medicare patients to UMDNJ that his conduct was in violation of the Stark Act." (Pl.'s Br. 3.)  The analysis of whether Defendant Campbell acted "knowingly" is a determination

regarding his state of mind.[9]  A reasonable jury may find that the United States has put forth enough

evidence to conclude that Defendant Campbell's conduct satisfies the FCA's scienter requirement.

However, "the Court 'must heed the basic rule that a defendant's state of mind typically should not

be decided on summary judgment.'"  *Landau v. Lucasti*, 680 F. Supp. 2d 659, 670 (D.N.J.2010)

(quoting *United States ex. rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 411 (3d Cir.1999)).

Thus, summary judgment is not appropriate to determine whether Defendant Campbell acted

"knowingly" or with "reckless disregard"as defined by the FCA.  The United States' Motion for

Partial Summary Judgment as to Count I will be denied.[10]


*Third Party Defendants' Motions for Summary Judgment as to Defendant Campbell's Amended*
*Third Party Complaint*

The Amended Third Party Complaint includes three counts.  Court I includes allegations of

fraudulent misrepresentations, upon which Defendant Campbell claims he relied and caused him to

enter into the employment contract with UMDNJ.    Count II is for alleged negligent

misrepresentations which Defendant Campbell claims he relied upon and caused him to enter into

the employment contract with UMDNJ.  Count III is for breach of contract.  For both Counts I and

II of the Third Party Complaint, Defendant Campbell demands judgment against UMDNJ, Richard

---

[9]  "The 1986 Amendments to the FCA, which added the scienter requirement, were not intended
to create a burdensome obligation.  Rather, the appropriate test is whether the defendant's actions were
'reasonable and prudent under the circumstances.'"  *Rogan*, 459 F. Supp. 2d at 716 (quoting S.Rep. No.
99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5161, 5286).

[10]  As this Motion for Partial Summary Judgment will be denied on other grounds, the Court need
not address Defendant Campbell's additional argument that the settlement between the United States and
UMDNJ prohibited summary judgment in this matter concerning Defendant Campbell.  (*See* Def's Opp
33.)

and Ellner, jointly and severally for "full contribution and/or indemnification, to reimburse Defendant for any and all damages, civil penalties, interest, costs, expenses, attorney's fees and such other relief as Plaintiff may obtain against Defendant in this case."(Answer to Am. Compl. and Am. Third Party Compl. 14.)  For Count I , Defendant Campbell demands "compensatory and punitive damages in an amount to be determined, together with costs and interest, and for such further relief as may be just and proper." (*Id.*)  For Count II for negligent misrepresentation,  Defendant Campbell demands "compensatory damages."(*Id.* at 15.)  Finally, for Count III (breach of contract), Defendant Campbell only demands compensatory damages, interest, costs and expenses and such relief as may be just and proper (there is no mention of contribution or indemnification).  (*Id.* at 16.)  The Third Party Defendants moved to dismiss all three counts with prejudice.  Defendant Campbell has voluntarily withdrawn his claim for breach of contract (Count III of the Defendant Campbell's Amended Third Party Complaint).[11]  The Court will address the remaining Counts I and II.

Defendant Campbell argues that he spoke to Richard about the legality of his employment contract prior to signing the agreement with UMDNJ, and was assured that legal counsel for UMDNJ had reviewed and approved the employment contract.  (Def.'s Opp. to UMDNJ & Richard 9.)  He relied on this assurance.   (Answer to Am. Compl. and Am. Third Party Compl. 11-12 at ¶8.) Defendant Campbell argues that it was "negligent for Richard to advise Defendant that UMDNJ's attorneys had confirmed that the proposed employment contract and arrangement were lawful and

---

[11]  In Defendant Campbell's brief filed on June 9, 2010 in opposition to motions for summary judgment by UMDNJ and Richard, it is stated that "Defendant [Campbell] withdraws Count III of the TPC [Amended Third Party Complaint] which alleged a breach of contract claim."  (Def.'s Opp. to UMDNJ & Richard 3 n.2).  Defendant Campbell concedes that the "at will" language in Defendant Campbell's employment contract "permitted UMDNJ to fire him."  (*Id.*)

17

acceptable.  Moreover, Defendant relied on those advisements in entering the employment contract."
(Def.'s Opp. to UMDNJ & Richard 22.)  Defendant Campbell also notes that the Federal Monitor
found that UMDNJ's Office of Legal Management was part of the illegal scheme and withheld
information from outside counsel when seeking guidance on whether the CAP contracts would
violate the Stark Act.  (*Id.* at 24.)  Defendant Campbell claims that this entire incident has damaged
his reputation and livelihood.  (*Id.* at 25-27; 6/8/10 Def.'s Resp. Statement to Pl., ¶¶ 85-91; Answer
to Compl. and Am. Third Party Compl. 14 at ¶ 18.)  The claims against Ellner include language
referring to the alleged damage to Defendant Campbell's "reputation and livelihood" and include
the assertion that "UMDNJ is liable for the above-referenced actions of Richard, Ellner and other
UMDNJ representatives under the doctrine of Respondent Superior."  (Answer to Am. Compl. and
Am. Third Party Compl. at 14.)

Defendant Campbell states that "Defendant's Amended Third Party Complaint . . . asserts
claims of fraudulent and negligent misrepresentation and seeks damages, in addition to contribution
and indemnification for any liability of Defendant to Plaintiff . . . ." (Def.'s Opp. to UMDNJ &
Richard at 1.)  As third party defendant UMDNJ asserts, "[w]hile Dr. Campbell's claims sound in
common law fraud and negligent misrepresentation, they seek contribution and indemnification from
UMDNJ." (UMDNJ Br.1.)  Defendant Campbell's claims against Richard and Ellner similarly seek
contribution and indemnification.  The Third Party Defendants contend that "state law claims that
seek contribution and/or indemnity or their equivalent are barred by the FCA and federal common
law." (UMDNJ Br. 2.)

FCA defendants cannot pursue claims for indemnification and contribution that are based
on their liability under the FCA or have the same effect as offsetting FCA liability.  *See United States*

18

*ex rel. Miller v. Bill Harbert Int'l Const.*, 505 F.Supp.2d 20, 26 (D.D.C. 2007).  Although a Third Circuit case addressing the issue of whether a FCA defendant can pursue claims of indemnification and contribution against third party defendants is not currently available, there is substantial law on this issue and it has been addressed by other courts.

The FCA does not provide for or speak of a right to indemnification or contribution and the legislative history of the FCA does not indicate that one may be implied.  *Mortgages, Inc. v. U.S. Dist. Court of Nev.*, 934 F.2d 209 (9 th Cir. 1991).  "Because the False Claims Act does not explicitly speak of a right to contribution or indemnification, courts must look to the statute's legislative history."  *United States v. Dynamics Research Corp.*, 441 F.Supp.2d 259, 264 ((citing Mortgages, 934 F.2d at 213.)  A review of the legislative history of the FCA does not provide for contribution or indemnification.  *See Mortgages*, 934 F.2d at 214.  In addition, federal common law provides that a defendant found liable of FCA violations cannot pursue a claim that will offset their liability or have the equivalent effect of contribution or indemnification.  *Miller*, 505 F. Supp. 2d at 26.  Further, courts have determined that "[t]he unavailability of contribution and indemnification for a defendant under the False Claims Act now seems beyond peradventure."  *Id.* (internal citations omitted).

In *Mortgages*, the Ninth Circuit ruled that a FCA defendant (Mortgages, Inc.) could not assert third party claims alleging "breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, negligence, negligent misrepresentation and conspiracy," where pursuant to each of these claims, defendants sought as relief "full indemnification and/or contribution." 934 F.2d at 211, 214.  The Ninth Circuit concluded that "[b]ecause there is no basis in the FCA or federal common law to provide a right to contribution or indemnity in a FCA action,

19

we conclude that there can be no right to assert state law counterclaims that, if prevailed on, would end in the same result." *Mortgages*, 934 F.2d at 214.

Counterclaims or third party claims by an FCA defendant that are based on damages which are independent claims may be permitted, so long as those claims do not "have the effect of providing for indemnification or contribution." *Miller*, 505 F. Supp. 2d 20 at 27 (internal citations omitted); *see also United States ex rel. Madden v. Gen. Dynamics Corp.*, 4 F.3d 827 (9th Cir. 1993). Permissible third party claims in the FCA context are available, for example, when a FCA defendant has a cause of action for damage to him independent of his FCA liability.  "[A] claim by an FCA defendant which requires for its success a finding that the FCA defendant is liable is the kind of claim barred by the FCA." *Miller*, 505 F. Supp. 2d at 28; *see also United States v. Nardone*, 782 F.Supp. 996, 999 (M.D. Pa. 1990) (dismissing FCA defendants' counterclaim and third party complaint seeking indemnification).

Counts I and II of the Amended Third Party Complaint do not contain independent claims for fraud and misrepresentation.  UMDNJ presents the following argument regarding Count I, which also applies to Count II for negligent misrepresentation:

> Two elements of his misrepresentation claim are contingent on such liability. First, the Offer Letter signed by Dr. Campbell is not unlawful absent a finding that Dr. Campbell is liable under the FCA. Thus, absent a jury finding of (a) Dr. Campbell's liability, or (b) the Offer Letter's illegality, UMDNJ cannot be said to have misrepresented the lawfulness of the Offer Letter. Second, damages are an essential element of a claim for negligent misrepresentation. *McClellan v. Feit*, 376 N.J. Super. 305, 317 (App. Div. 2005). In the absence of a finding of FCA liability, Dr. Campbell can show no damages flowing from any representation made by UMDNJ or its employees.

(UMDNJ Br. 15.).

In addition to indemnification and contribution, Count I includes a demand for "compensatory and punitive damages" and Count II demands "compensatory damages." However, these demands combined with the request for indemnification and contribution still have the effect of offsetting liability if Defendant Campbell is found liable under the FCA as no other basis for damages has been provided.

Defendant Campbell relies on *Cell Therapeutics, Inc. v. Lash Group, Inc.*, a Ninth Circuit case, to support his argument for maintaining Counts I and II of the Amended Third Party Complaint. 586 F.3d 1204 (9th Cir. 2009). However, *Lash* is distinguishable from the instant matter, and also contains support for the position that an FCA defendant is not entitled to indemnification and contribution based on FCA liability. 586 F.3d at1208-09. In *Lash*, Cell Therapeutics, Inc., a biotechnology company, contracted with Lash Group to provide Medicare reimbursement and consulting services regarding a new cancer drug. *Id.* at 1206. Lash Group incorrectly advised Cell Therapeutics that the company, and in turn other medical providers, could be reimbursed by Medicare for other off-label uses of the drug, which the FDA had not approved. *Id.* at 1207. This incorrect advice led to several negative consequences including the discontinuation of research and the government filing a qui tam suit against Cell Therapeutics under the FCA (which was later settled). *Id.* Cell Therapeutics sued Lash Group for breach of a *contractual indemnification clause* and independent claims (including breach of contract and negligence/breach of the duty of care in providing professional services). *Id.* Cell Therapeutics alleged that "Lash's bad advice resulted in $12.3 million in damages in addition to the $10.5 million [Cell Therapeutics] paid to settle the government's claims." *Id.* at 1209.

While the *Lash* court did find that FCA defendants could maintain claims against third party

21

defendants, the *Lash* court noted that it is "incumbent on the district court to separate those claims for damages which 'only have the effect of offsetting liability' from those that are not dependent on a . . . defendant's liability under the FCA." *Id.*  Further, "[c]laims for independent damages are distinguishable from claims for indemnification or contribution, which, by definition, 'only have the effect of offsetting liability.'"*Id.* at 1208.

In the instant matter, Defendant Campbell's Counts I and II, although worded to include allegations of fraud and misrepresentation, seek indemnification and contribution that obviously requires damage to Defendant Campbell that is based on a finding that he is liable under the FCA.[12] As such, the claims in Counts I and II are not permissible.  If Defendant Campbell is not found liable under the FCA, he may bring these claims against the Third Party Defendants and additional arguments regarding these claims would be addressed at that time.  *Id.*  As Defendant Campbell is precluded from seeking indemnification and contribution for claims dependent on his liability under the FCA,  Counts I and II of his Third Party Complaint will be dismissed without prejudice.  Thus, the Third Party Motions for Summary Judgment on those counts will be granted in part.

**Conclusion**

For the foregoing reasons, the Court denies the Motion for Partial Summary Judgment by the

---

[12]  Ellner raises arguments regarding the New Jersey Tort Claims Act ("NJTCA"), to which UMDNJ joins, including that Defendants claims are precluded because 1) proper notice was not given under the statute, 2) as a public entity, UMDNJ and public employees Richard and Ellner would not be subject to suit; and 3) the relevant exception to the NJTCA requirements are indemnification and contribution, which would not be available to Defendant Campbell.  However, the Court need not address this argument at this time as Counts I and Count II of Defendant Campbell's third party claims would have the effect of offsetting FCA liability.  As such, this Court will dismiss Counts I and II without prejudice.

United States as to Count I and grants the Third Party Motions for Summary Judgment as to Counts

I and II, which will be dismissed without prejudice.   Count III of the Amended Third Party

Complaint has been withdrawn.


s/Susan D. Wigenton, U.S.D.J.


Orig:       Clerk
cc:         Judge Arleo
            Parties